**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

RYAN KOMPPA,

                    Plaintiff,

    -against-

NEXTECH INFRASTRUCTURE PARTNERS LLC,
HOWARD HOROWITZ, KESTREL VENTURE
PARTNERS, L.P., KESTREL VENTURES LLC,
and CHRIS FLYNN,

                Defendants.

Civil Action No.: _____

**COMPLAINT**
**WITH JURY DEMAND**

Plaintiff, Ryan Komppa ("Komppa"), by and through his attorneys, Volin Employment Law, PLLC and Mazzola Lindstrom LLP, as and for his complaint against defendants, NexTech Infrastructure Partners LLC ("NexTech"), Howard Horowitz ("Horowitz"), Kestrel Venture Partners, L.P., Kestrel Ventures LLC (together, "Kestrel Ventures"), and Chris Flynn ("Flynn," and, collectively, "Defendants"), alleges as follows:

<u>**NATURE OF THE CASE**</u>

1.      Komppa brings this action for damages for breach of an exclusive private placement agreement by which Komppa secured commitments for private equity investments and partnership deals for NexTech, for the development of a computer data storage venture (the "PPA"). The PPA obligated NexTech to pay Komppa "success fees" consisting of percentages of the equity commitments and deals that Komppa secured for NexTech.

2.      Komppa secured hundreds of millions of dollars of investment commitments in NexTech from large, institutional investors, Gordon & Co., L.P. ("Angelo Gordon") and MSD Capital, L.P. ("MSD").

3.      Additionally, Komppa secured a commitment from McCarthy Cook & Co. ("MCC") to provide operational sponsorship, such that MCC would run the back office and provide financial backing for NexTech in order to work on the Chicago "Wood Dale" development deal and then build the platform.

4.      Komppa also secured an add-on commitment from Townsend Group ("Townsend").

5.      These commitments satisfied the terms of the PPA.

6.      It was only due to the bad faith of NexTech and its principals that the commitments were not accepted.

7.      As there was no good-faith reason for NexTech to not accept the commitments, Komppa is entitled to payment of his fees.

8.      These investors were all committed and ready to invest in NexTech, but defendants Horowitz and Flynn, acting in the furtherance of their own personal, individual interests – rather than in the corporate interests of NexTech – prevented NexTech from accepted these investments and these deals from closing.

9.      Accordingly, Komppa sues under breach of contract for the failure to pay his contractually due success fees under the PPA. Komppa also sues for breach of the non-circumvention and non-disclosure clauses of the contract, and breach of implied duties of good faith and fair dealing for the failure to have Komppa benefit from the PPA, because NexTech failed to accept and close on the commitments, and had no commercially appropriate reason, to decline

to accept the offers. Komppa also brings claims for quantum meruit and unjust enrichment against the members of NexTech, Horowitz and Flynn, for the benefits that each received from Komppa's services and confidential and proprietary work product. Finally, Komppa asserts claims of tortious interference with contract by Horowitz and Flynn, inasmuch as, by acting maliciously and to the detriment of NexTech, they undermined the commitments and the very purpose for which Komppa had been retained, to find investors who were ready, willing and able to invest in NexTech.

## THE PARTIES

**Plaintiff**

10.     Plaintiff Ryan Komppa is an individual who resides in California.

**Defendants**

11.     Defendant NexTech Infrastructure Partners LLC ("NexTech") is a limited liability company organized pursuant to the laws of Delaware with its principal, executive office located at 323 Kestrel Way, North Garden, VA 22959.

12.     NexTech has only two members, individuals who reside in Virginia and Maryland, respectively.

13.     Defendant Howard Horowitz is a member of NexTech and resides in Virginia.

14.     Defendant Chris Flynn is the other NexTech member and resides in Maryland.

15.     Defendant Kestrel Venture Partners, L.P. ("Kestrel LP") is a limited partnership organized pursuant to the laws of Delaware and with its principal, executive office located at 323 Kestrel Way, North Garden, VA 22959.

16.     Horowitz is the general partner of Kestrel LP.

17.     No other partners of Kestrel LP reside in California.

18.     Defendant Kestrel Ventures LLC ("Kestrel LLC") is a limited liability company organized pursuant to the laws of Delaware with its agent's address located at 251 Little Falls Drive, Wilmington, New Castle County, Delaware 19808, with its principal office located in Virginia.

19.     Horowitz is the managing member of Kestrel LLC.

20.     No other members of Kestrel LLC reside in California.

21.     Hereafter, Kestrel LP and Kestrel LLC are together referred to as "Kestrel Ventures."

## JURISDICTION AND VENUE

22.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

23.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1332(a)(1).  There is complete diversity between the parties, because Plaintiff is a domiciliary of California, while each Defendant is a domiciliary of Virginia, Maryland, or Delaware, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

24.     This Court has personal jurisdiction over Defendants due to their continuous and systematic contacts within the jurisdiction in Virginia during the relevant time period.  Defendants NexTech, Kestral LP and Kestral LLC have their principal, executive offices in Virginia. Defendant Horowitz resides in Virginia. Defendants Horowitz and Flynn are members and/or partners of defendants NexTech, Kestral LP and Kestral LLC.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims at issue herein occurred in this District.

## THE FACTS

**Komppa Is Introduced to Flynn, Horowitz, and Reed and**
**The Group Explore Collectively Launching A Data Center Venture**

26.    In March 2020, Komppa and Flynn were introduced by a mutual acquaintance, and Komppa proposed to Flynn the prospect of launching an industrial-scale data center platform.

27.    Komppa and Flynn discussed that such a data center platform would be a promising investment due to the ever-increasing demand for data storage and information back-up, as well as the need for stable and reliable power, environmental controls, and security to house and protect the computer servers and related telecommunications equipment for the platform.

28.    Komppa possessed the requisite experience, connections, and expertise to locate investors and raise capital for such a venture.

29.    Komppa was and is an experienced investment fundraiser and business matchmaker.

30.    Komppa had also spent the prior two years raising capital in a nearly identical venture.

31.    Flynn told Komppa that he had been discussing with certain of his own contacts launching just such an effort and that he would introduce Komppa to them.

32.    At the time, Flynn was employed as the Chief Investment Officer of Strategic Data Center Fund Manager, LLC, known as Strategic Capital ("Strategic Capital").

33.    Flynn told Komppa, however, that he was working on that venture independently of and without the knowledge of his employer, Strategic Capital.

34.    In May 2020, Flynn introduced Komppa to Jason Reed, who was to be the firm's third partner and at the time was their in-house legal advisor.

35.    Later that month, Flynn introduced Komppa to Horowitz as his longtime friend, the former head of real estate for Equinix, and fellow owner in NexTech.

36.    Horowitz and Flynn told Komppa they had for several years been discussing launching a data center platform venture.

37.    Flynn, Reed, Horowitz, and Komppa began exchanging ideas and decided to explore launching a data center platform venture together.

38.    Horowitz would serve in the role of chairman and senior advisor for the venture and would devote approximately ten to twenty hours of his time per week to the venture.

39.    Flynn would serve as head of acquisitions, and the group would seek out one other senior professional.

**The Group Enter Into an NDA and NexTech Becomes**
**The Investment Vehicle for the Data Center Investment Venture**

40.    In mid to late 2020, Reed, Horowitz, Flynn, and Komppa entered into a non-disclosure agreement ("NDA") that protects proprietary and confidential information shared in connection with the data center investment venture which the NDA terms the "Opportunity."[1]

41.    The NDA protects all confidential and proprietary information (defined as "Confidential Information") provided for Opportunity (NDA, ¶ 1), stating that the parties are:

> [T]o use the Confidential Information provided by the Other Party solely for the purpose of evaluating the Opportunity, and for no other purpose, and further agree[d] to keep confidential and not disclose to any third person any Confidential Information.  NDA, ¶ 2.

42.    The NDA provides that any breach entitles the disclosing party to seek injunctive relief, in addition to any remedy available at law, stating as follows:

---

[1] The NDA became incorporated into the PPA, as Exhibit C. The PPA, along with its exhibits, is submitted as Exhibit 1 to this complaint.

> [A]ny breach of the Agreement would cause irreparable harm to the Disclosing Party for which damages are not an adequate remedy and that the Disclosing Party shall therefore be entitled (without the posing of a bond or other security) to seek equitable relief in addition to all other remedies available at law.  NDA, ¶ 8.

43.    The NDA states that it "will remain in effect with respect to any particular Confidential Information for a period of two (2) years following the last date of receipt of any Confidential Information."  NDA, ¶ 7.

44.    In late 2020, Reed left the venture.

45.    Horowitz then decided to devote himself full time to pursuing the data center investment venture with Flynn and Komppa.

46.    Horowitz represented to Komppa that he would go forward with Komppa regardless whether Flynn wished to continue his involvement.

47.    About the same time, Horowitz and Flynn decided that NexTech would be the investment vehicle for the data center venture.

**NexTech and Komppa Enter Into an
Exclusive Private Placement Agreement**

48.    In November 2020, NexTech members Flynn and Horowitz decided to engage Komppa's services as an exclusive placement agent to secure investments in, or partners for, NexTech.

49.    Subsequently, Ryan Sullivan joined as a third investment professional of the NexTech team.

50.    NexTech and Komppa entered into an "Exclusive Private Placement Agreement," dated November 12, 2020 ("PPA"), a copy of which is attached hereto as Exhibit 1.

51.    By the PPA, NexTech engaged Komppa as "its exclusive outside placement agent to identify capital partners to partner with NexTech across its future property level investments as well as investments in NexTech and its related operating and investment entities." PPA, pg. 1.

52.    The PPA confirms that Komppa and NexTech "contemplate that NexTech will principally invest in data center and technology infrastructure debt and equity classes throughout the United States and globally." PPA, pg. 1.

53.    Paragraph 1 of the PPA lists Komppa's services for NexTech as follows:

1.    <u>Scope of Services.</u>

Mr. Komppa undertakes to provide the following services ("Services"):

a)    Assist with developing NexTech's marketing materials to attract institutional caliber Investors for an anticipated programmatic joint venture, seed or growth capital investment, fund investment or one-off equity investments;

b)    Assist with developing relationships, channels, and due diligence review/acceptance with Investors; and

c)    Assist with equity capital raising.

PPA, ¶ 1 ("Scope of Services").

54.    Paragraph 6 of the PPA specified that Komppa "is to provide the Services as exclusive outside capital agent for new equity for the term of this Agreement." PPA, ¶ 1 ("Exclusivity").

55.    The term of the PPA is three hundred sixty days from the date of the PPA (*i.e.,* November 12, 2020) unless extended in writing by Komppa and NexTech.

56.    In exchange for Komppa's Services, the PPA requires NexTech to pay Komppa "a success-based fee" (the "Success Fee") equal to percentages of "equity committed" in accordance with a fee schedule set forth in Exhibit A to the PPA and pursuant to the payment terms set forth in Exhibit B to the PPA.

57.     Paragraph 5 of the PPA states:

    5.     <u>Compensation.</u>

        In consideration of Mr. Komppa providing the Services and subject to the provisions of this Agreement, NexTech shall pay to Mr. Komppa the fees as set out in the Fee Schedule attached to this Agreement as Exhibit A (the "**Fee Schedule**"). The Fees shall be payable by NexTech in accordance with the payment terms set out in Exhibit B to this Agreement.

PPA, ¶ 5 ("Compensation").

**<u>Komppa Renders Services Pursuant to the PPA</u>**

58.     Upon execution of the PPA on November 12, 2020, Komppa immediately began rendering services pursuant thereto.

59.     From December 2020 to February 2021, Komppa developed and provided to NexTech, Horowitz, Flynn and Sullivan proprietary and confidential work product, which consisted of, among other things: strategic plan for NexTech's capital raising; investor market intelligence; a marketing deck; and financial models; and a short list of suitable investors to be targeted for equity capital investments ("Work Product").

60.     Komppa designated his Work Product as "Confidential" in accordance with the terms of the PPA's NDA.

61.     Beginning in February 2021, Komppa embarked on soliciting the investors he identified on his short list for NexTech.

62.     As set forth below, in rendering services pursuant to the PPA and during the term of the PPA, Komppa secured equity commitments from Gordon and MSD, an operational support agreement from MCC, and an add-on commitment from Townsend, all pursuant to the PPA, and all with the expectation of being paid for his services.

63.     Each of the equity commitments that Komppa secured were suitable, appropriate and in accord with the intent of the PPA.

64.     In rendering services pursuant to the PPA, Komppa expected NexTech, Horowitz, Flynn and Sullivan not to circumvent the PPA by exploiting Komppa's services for purposes not intended by the PPA or for the individual benefit of Kestrel Ventures and/or Horowitz.

65.     In rendering services pursuant to the PPA, Komppa expected NexTech, Horowitz, Flynn and Sullivan not to circumvent the PPA or to use Komppa's services for purposes not intended by the PPA.

66.     In rendering services pursuant to the PPA, Komppa expected NexTech, Horowitz, Flynn and Sullivan to abide by the terms of the PPA's NDA and not to use his Work Product for their own personal benefit or in contravention with the PPA's NDA.

**The Team Identify a Data Center Location and Discuss Partnership**

67.     In March and April of 2021, the NexTech team – *i.e.*, Komppa, Horowitz and Flynn – discussed a prospective data center property in Santa Clara, CA ("2175 Martin") as a location in which to invest, and a potential partnership and operating agreement among them for NexTech, to be denominated the "NexTech Partnership."

68.     The NexTech Partnership would have given Horowitz 33% ownership of NexTech with Komppa, Flynn and Sullivan each having a 22% partnership interest. The Partnership and Operating agreement was prepared by Brian Alperstein in April of 2021. Alperstein, Komppa and Horowitz met in Washington DC at the end of April 2021 to discuss this in person and agreed on the terms.

69.     The anticipated value of the NexTech Partnership was extremely substantial, with over $1 billion of anticipated revenue generated over eight to ten years.

**Angelo Gordon's Equity Commitment**

70.     As a result of Komppa's efforts, in March 2021, Angelo Gordon, a large muti-strategy investor, made a $600 million equity commitment to NexTech.

71.     In a term sheet issued on June 7, 2021, Angelo Gordon presented a $600 million equity commitment to NexTech.

72.      The terms of Angelo Gordon's equity commitment were extremely desirable for NexTech.

73.     Other investment professionals agreed that Angelo Gordon's equity commitment was extremely attractive for NexTech.

74.     Thomas McCarthy and Edward Cook of MCC advised that Angelo Gordon's term sheet to NexTech was "the best term sheet they had ever seen in their careers."

75.     Angelo Gordon informed Horowitz of its strong desire that NexTech accept its commitment, and its desire to close with NexTech.

76.     Nearly every day during the week of April 19, 2021, NexTech principals spoke with Komppa, discussing Angelo Gordon's equity commitment.

77.     The NexTech principals agreed that it was an attractive offer.

78.     Likewise, from mid March through May 2021, Komppa and Glassberg of Angelo Gordon, spoke nearly weekly (sometimes more), as both Angelo Gordon and Komppa waited for NexTech to accept Angelo Gordon's equity commitment and close on the deal.

79.     From April 28 through April 30, 2021, Matt Jackson, Scott Glassberg, Reid Liffman and a handful of other investment staff from Angelo Gordon met with Horowitz, Flynn, and Komppa in Washington, D.C. to discuss Angelo Gordon's equity commitment.

80.     The meetings in Washington, D.C. ended amicably.

81.    Angelo Gordon, led by Reid, expressed keen interest in investing in the platform and looked to arrange follow up meetings to finalize the investment.

82.    Horowitz, Flynn, Sullivan and Komppa agreed to meet with the Angelo Gordon team in late June 2021 in New York City to close on the deal.

83.    However, Horowitz delayed and stalled on accepting Angelo Gordon's equity commitment.

84.    On June 25, 2021, using a Kestrel LP email address, Horowitz wrote to the Angelo Gordon team, stating:

> We are committed to making a decision the end of next week and may come back to you early in the week for a few minor clarifications of the term sheet. This decision has frankly become more difficult than I initially envisioned, and I speak for our team in saying we all greatly appreciate your patience in hanging in there with us.

85.    During the week of June 14, 2021, Horowitz told the NexTech team members not to travel to New York to close on Angelo Gordon's equity commitment. After cancelling the meeting Horowitz stated that he decided to seek out other investors.

86.    In July 2021, Angelo Gordon brought its investment team to New York City to meet with the NexTech team, but, per the instruction of Horowitz, only Horowitz met with them, and terminated the Angelo Gordon deal.

87.    During this time, as it turns out, Flynn – with the knowledge of Horowitz – was also negotiating a different deal with a different potential investor (on behalf of Strategic Capital), behind Komppa's back, totally unbeknownst to Komppa.

88.    Horowitz caused NexTech not to close on Angelo Gordon's equity commitment.

**MSD's Equity Commitment**

89.     Instead of accepting Angelo Gordon equity commitment, Horowitz met with Nick Newburger and Coburn Packard of MSD in in New York City in mid-June 2021.

90.     Horowitz was excited about MSD's relationship with Dell and felt that MSD would therefore be a better investor.

91.     During July 11 through 13, 2021, Horowitz, Flynn, Sullivan, and Komppa met with Nick Newburger and Coburn Packard of MSD in New York City.

92.     After the meeting with MSD in mid-July 2021, NexTech, Horowitz, Flynn, and Sullivan collectively determined to secure an equity investment for NexTech from MSD among all other possible investors.

93.     MSD conveyed its $600 million equity investment offer to NexTech by a term sheet, dated July 21, 2021.

94.     MSD informed Horowitz and Komppa of their desire to close on their capital commitment to NexTech.

95.     However, in or about late June to July 2021, Horowitz began to consider having Kestrel Ventures invest in a data center platform project centered in Wood Dale, Illinois, a suburb of Chicago, utilizing equity from MSD to do so.

96.     The development opportunity was presented to MSD and Starwood Capital in September of 2021, both of which indicated that they would be interested in pursuing the deal.

97.     Horowitz and Flynn caused NexTech not to close on MSD's equity commitment.

98.     In lieu of closing on MSD, Horowitz and Flynn began to pursue investing in the Wood Dale project through Kestrel Ventures which Horowitz indicated would be a way to "make

it up" to the team for bailing on the project and serve as a way for everyone to still make a fair amount of money for the efforts over the previous year.

**Townsend Add-On Commitment**

99.     Townsend committed to an "add-on" investment of $150 million.

**Komppa Renders Services Under the PPA Based On Horowitz's and Flynn's Inducements**

100.     In mid-September 2021, Horowitz informed Komppa that he no longer desired to be involved with NexTech.

101.     Around the same time, Flynn informed Komppa that he no longer desired to be involved in NexTech, and, despite resigning earlier in the year, continued his position in a company known as "Strategic Capital," which had formed an investment vehicle called "Strategic Datasphere" to deploy $1.5 billion of capital into the data center sector.

102.     Horowitz informed Komppa that he was lowering his involvement with NexTech.

103.     Horowitz was motivated, in part, by the desire to protect Flynn's involvement with Strategic Capital.

104.      Horowitz said that he was moving forward with Wood Dale venture outside of NexTech to "make up for" bailing out on the NexTech venture.

105.     Therefore, Komppa continued to render services pursuant to the PPA.

106.     In or about late November 2021, Horowitz informed Komppa that he was investing in LS Power's parent company, Digital Infrastructure – which he intended to utilize as the source of equity for the Wood Dale deal.

107.     As Horowitz and Flynn indicated that they were not willing to take the entrepreneurial risk and effort involved in their original efforts in NexTech, in October through November 2021, Komppa worked to secure a platform level investment, back-office support, and

general support from MCC, initially starting with an investment and co-sponsorship in the Wood Dale project.

108.    Horowitz and Flynn then informed Komppa that they had abandoned efforts to launch a start-up venture, and Horowitz informed Komppa that he and Flynn were interested in having Komppa secure a partnership with MCC.

109.    Based on their statements to him, Komppa began working with MCC to formulate a co-sponsorship and partnership agreement for NexTech, Flynn, Horowitz and Komppa that would allow Horowitz and Flynn to proceed without the entrepreneurial risk and effort that had otherwise precluded them from moving forward with NexTech.

110.    In October 2021, MCC provided deal terms for a partnership on the Wood Dale development and subsequent ongoing platform sponsorship.

111.    In October 2021, Horowitz told Komppa that the MCC proposal is "a great fit" but that it needed to provide Flynn a larger interest.

112.    Therefore, Komppa sought from MCC a more substantial interest for Flynn.

113.    After Komppa secured a more generous deal package for Flynn, Horowitz advised that Flynn's proposed share was too high.

114.    Horowitz thereby undermined the MCC deal by taking contradictory positions, simultaneously demanding that Flynn have a more significant interest in the venture and then demanding a lower partnership interest for Flynn.

115.    This was also counter to Horowitz's initial claim that he would move forward regardless of Flynn's involvement.

**NexTech, Horowitz and Flynn Reveal Their Secret Actions After the PPA Expires**

116.    On November 7, 2021, the 360-day term of the PPA expired.

15

117.    On November 24, 2021, Horowitz informed Komppa that he was joining LS Power.

118.    Despite stating that he was on board with the MCC deal, and that it was a great fit, Horowitz decided to pursue an investment from LS Power, claiming that he preferred them because they were headquartered on the east coast.

119.    In violation of his duty of good faith and fair dealing, Horowitz decided to step back from NexTech while continuing to pursue the Wood Dale deal, while representing that the NexTech team members – *i.e.*, Komppa and Flynn – would be compensated.

120.    Komppa worked frantically to contact all of the previously ready, willing and able investors to see if they would be willing to work with NexTech with Horowitz in a part-time role, and each said they would consider one-off deals, but not the previously offered ongoing partnership / joint venture arrangements.

121.    Komppa understands that the LS Power deal involved full financial sponsorship and equity investment into the Wood Dale investment.

122.    Horowitz later revealed that that investment from LS Power ultimately failed, as his connection at the company (and head of data center investments) was no longer continuing at his role at LS Power.

**<u>Alter Ego Liability</u>**

123.    Plaintiff incorporates herein by reference the preceding allegations as if fully restated herein.

124.    Defendants Horowitz, Flynn, and the NexTech and the Kestrel entities are alter egos of each other, because the NexTech and Kestrel entities are owned and managed by the same principal, *i.e.*, defendant Horowitz, and function as a *de facto* partnership, having a common

business purpose, shared resources, shared ownership, and shared personnel. Likewise, Horowitz and Flynn functioned as de facto partners.

125.    Additionally, NexTech was under-capitalized, and was really just a shell, as were the Kestrel entities.

126.    Because defendants Horowitz, Flynn, and the NexTech and the Kestrel entities failed to respect the legal requirements, and due to the abuses of the business form by virtue of the transfer of Komppa's confidential work product from one business to the other, to his detriment, Komppa is entitled to pierce the structures of the business entity defendants, and hold each of defendants Horowitz, NexTech and the Kestrel entities liable for the breaches of the other.

## FIRST CAUSE OF ACTION
### (Breach of Contract – Breach of PPA's Success Fee)
### (Against Defendant NexTech and Horowitz)

127.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

128.    Komppa fully performed his obligations required by the PPA.

129.    During the term of the PPA, Komppa secured an equity commitment from Angelo Gordon valued at $600 million, plus a $10 million platform commitment.

130.    During the term of the PPA, Komppa secured an equity commitment from MSD valued at $600 million.

131.    During the term of the PPA, Komppa secured an add-on commitments Townsend valued at $150 million.

132.    Pursuant to Paragraph 5 of the PPA and Paragraph A.1 of the PPA's Fee Schedule (Exhibit A to the PPA), Komppa earned fees as follows:

**NexTech - $600m commitment + $10m platform funding**

| | | |
|---|---|---|
| 2% first $200m | $200m x 2% | $4 million |
| 1.75% next $300m | $300m x 1.75% | $5.25 million |
| 1.5% thereafter | $110m x 1.5% | $1.65 million |
| TOTAL | | $10.9million |

**Wood Dale - $460m equity commitment**

| | | |
|---|---|---|
| 2% first $200m | $200m * 2% | $4 million |
| 1.75% next $300m | $260m * 1.75% | $4.55 million |
| TOTAL | | $8.55million |

**Townsend Add-On investment**

| | | |
|---|---|---|
| 1.5% thereafter | $150m * 1.5% | $2.25 million |

("thereafter" – as it assumes the initial ~$500m would be provided by MSD or Angelo Gordon)

133.    Pursuant to Paragraph B.1 of the Payment Terms Komppa issued an invoice to NexTech for the fees due to him.

134.    NexTech has failed to pay Komppa's invoice and 30 days have transpired after NexTech's receipt of Komppa's invoice.

135.    Defendant NexTech breached the PPA.

136.    Horowitz controlled and directed the actions of NexTech.

137.    By virtue of the foregoing, Komppa is entitled to damages from NexTech in an amount to be proved at trial.

138.    As alter ego of NexTech Horowitz is jointly and severally liable for such damages.

## SECOND CAUSE OF ACTION
**(Breach of Contract – Breach of PPA's Non-Circumvention Terms)**
**(Against Defendant NexTech and Horowitz)**

139.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, and hereby alleges in the alternative as follows:

140.    Defendants NexTech circumvented and diverted Komppa's efforts and services rendered pursuant to the PPA to prevent Komppa from receiving the benefit of a Business Opportunity, as defined by the PPA while using, exploiting and diverting Komppa's Work Product to other entities and persons, including Kestrel Ventures, Horowitz, and Flynn, for purposes not permitted by the PPA and to benefit other entities and persons, including Kestrel Ventures, Horowitz, and Flynn, for the benefit of those persons and entities without compensation to Komppa.

141.    Defendant NexTech breached Paragraph 7 of the PPA.

142.    Horowitz controlled and directed the actions of NexTech.

143.    By virtue of the foregoing, Komppa is entitled to damages from NexTech and Horowitz in an amount to be proved at trial.

## THIRD CAUSE OF ACTION
**(Breach of Contract – Breach of PPA's NDA)**
**(Against Defendants NexTech and Horowitz)**

144.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, and hereby alleges in the alternative as follows:

145.    NexTech and Horowitz used and exploited Komppa's confidential and proprietary Work Product provided for purposes not permitted by the PPA's NDA.

146.    NexTech and Horowitz distributed and used Komppa's confidential and proprietary Work Product to third parties and persons not permitted by the PPA's NDA to receive and/or use Komppa's Work Product, including, but not limited to, Kestrel Ventures.

147.    Defendants Nextech and Horowitz thereby breached the PPA's NDA.

148.    By virtue of the foregoing, Komppa is entitled to damages from NexTech and Horowitz in an amount to be proved at trial.

### FIFTH CAUSE OF ACTION
**(Breach of Duty of Good Faith and Fair Dealing)**
**(Against Defendants NexTech and Horowitz)**

149.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, and hereby alleges in the alternative as follows:

150.    The PPA contains an implied duty of good faith and fair dealing implied by the PPA which requires NexTech not to do anything that would destroy or injure the right of Komppa to receive the benefits of the PPA.

151.    The PPA's NDA contains an implied duty of good faith and fair dealing implied by the PPA's NDA which requires NexTech and Horowitz not do to anything that would destroy or injure the right of the Komppa to receive the benefits of the PPA's NDA.

152.    Defendant Horowitz directed and controlled the conduct of defendant NexTech.

153.    Defendants NexTech and Horowitz breached the implied duty of good faith and fair dealing implied by the PPA and the PPA's NDA.

154.    By virtue of the foregoing, Komppa is entitled to damages from NexTech and Horowitz in an amount to be proved at trial.

## SIXTH CAUSE OF ACTION
### (Quantum Meruit)
### (Against Defendants Horowitz and Flynn)

155.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, and hereby alleges in the alternative as follows:

156.    Komppa provided benefits to defendants Horowitz and Flynn.

157.    Defendants Horowitz and Flynn accepted and retained the benefits that Komppa provided to them.

158.    Komppa reasonably expected payment from defendants Horowitz and Flynn for the benefits Komppa provided to them.

159.    Defendants Horowitz and Flynn accepted and retained the benefits that Komppa provided to them.

160.    Komppa is entitled to payment from defendants Horowitz and Flynn, on a quantum meruit basis, of the value of his work.

161.    By virtue of the foregoing, Komppa is entitled to damages from defendants Horowitz and Flynn, such amount constituting the reasonable value of Komppa's services, such amount to be proved at trial.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment)
### (Against Defendants NexTech, Horowitz and Flynn)

162.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, and hereby alleges in the alternative as follows:

163.    Defendants NexTech, Horowitz and Flynn have each been enriched by the services, efforts and Work Product that Komppa provided to them.

21

164.    The enrichment of each of defendants NexTech, Horowitz and Flynn has been at the expense of Komppa.

165.     The retention by Defendants Horowitz and Flynn of their enrichment is unjust.

166.    Defendants Horowitz and Flynn accepted and retained the benefits that Komppa provided to them.

167.    Komppa is entitled to payment for the value of the benefit to NexTech, Horowitz and Flynn of Komppa's work.

168.    By virtue of the foregoing, Komppa is entitled to damages from Horowitz and Flynn in an amount to be proved at trial.

169.    By virtue of the foregoing, Komppa is entitled to damages from Defendants NexTech, Horowitz and Flynn, at an amount to be proved at trial.

**EIGHTH CAUSE OF ACTION**
**(Tortious Interference with Contract)**
**(Against Defendants Horowitz, Flynn and Kestrel)**

170.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, and hereby alleges in the alternative as follows:

171.    Komppa and NexTech entered into a valid and enforceable PPA contract and accompanying NDA, pursuant to which Komppa was to find suitable investors for NexTech.

172.    Horowitz, a member of NexTech, at all relevant times, had actual knowledge of the PPA and the NDA between Komppa and NexTech.

173.    Flynn, at all relevant times, had actual knowledge of the PPA and NDA between Komppa and NexTech.

174. Defendant Horowitz intentionally interfered with the contractual relationship between Komppa and NexTech by misusing confidential information obtained through his position as a member of NexTech.

175. Specifically, defendant Horowitz accessed and disclosed to third persons Komppa's Work Product created for NexTech pursuant to the PPA and governed by the NDA and used Komppa's Work Product to undermine and vitiate Komppa's rights under the PPA and NDA.

176. Defendant Horowitz's conduct was undertaken with the intent to cause, and did cause, a breach of the PPA and the NDA.

177. Defendant Flynn intentionally interfered with the contractual relationship between Komppa and NexTech by misusing confidential information obtained through his relationship with Horowitz.

178. Specifically, defendant Flynn accessed and disclosed to third persons Komppa's Work Product created for NexTech pursuant to the PPA and governed by the NDA and used Komppa's Work Product to undermine and vitiate Komppa's rights under the PPA and NDA.

179. Defendant Flynn's conduct was undertaken with the intent to cause, and did cause, a breach of the PPA and the NDA.

180. The Kestrel defendants intentionally interfered with the contractual relationship between Komppa and NexTech by misusing confidential information obtained from their principal Horowitz.

181. Specifically, the Kestrel defendants accessed and disclosed to third persons Komppa's Work Product created for NexTech pursuant to the PPA and governed by the NDA and used Komppa's Work Product to undermine and vitiate Komppa's rights under the PPA and NDA.

182.    The Kestrel defendants' conduct was undertaken with the intent to cause, and did cause, a breach of the PPA and the NDA.

183.    Defendants Horowitz and Flynn and the Kestrel defendants' interference was accomplished through improper methods, including the misuse of confidential information, which Virginia law recognizes as a basis for liability in tortious interference claims involving contracts terminable at will or prospective business expectancies.

184.    As a direct and proximate result of defendants' tortious interference, Komppa suffered damages including lost revenue, reputational harm, and other economic losses.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

***

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, plaintiff Ryan Komppa, hereby prays for the

following relief:

1.     For an award of actual, punitive, compensatory, consequential, exemplary and/or

special damages in an amount to be determined at trial;

2.     For an order awarding the costs of this action, including reasonable attorneys' fees;

and for an order awarding such other and further relief as this Court may deem just and proper.

Dated: November 10, 2025


                              **VOLIN EMPLOYMENT LAW, PLLC**

                    By:      /s/ Richard M. Volin_____
                              Richard M. Volin (Virginia Bar No. 87198)
                              313 Park Avenue, Suite 200A
                              Falls Church, VA 22046
                              703.988.1460 (Phone)
                              703.988.3484 (Fax)
                              rich@volinemploymentlaw.com


                              **MAZZOLA LINDSTROM LLP**
                              Stephen L. Brodsky
                              1350 Avenue of the Americas, 2nd Floor
                              New York, New York 10019
                              646.216.8300
                              stephen@mazzolalindstrom.com
                              (Pro hac vice application to be filed)

                              *Attorneys for plaintiff Ryan Komppa*